Filed 12/30/21  Jane Does v. Salesforce.com CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| JANE DOES #1-50,<br><br>        Plaintiffs and Appellants,<br>v.<br>SALESFORCE.COM, INC.,<br><br>        Defendant and Respondent. | A159566<br><br>(San Francisco County<br>Super. Ct. No. CGC19574770) |

The Jane Doe plaintiffs in this case allege that as minors they were sexually trafficked and exploited by the website "Backpage" through advertisements posted on the website by pimps and sex traffickers.  They filed a complaint for damages in San Francisco Superior Court against Salesforce.com, Inc. (Salesforce), a company that allegedly contracted to provide Backpage with software and services, while knowing that Backpage was being used as a marketplace for commercial sex and sex trafficking.  In their Second Amended Complaint, at issue here, plaintiffs sought damages from Salesforce for sex trafficking, negligence, and gross negligence. Salesforce demurred that the complaint failed to state a claim on multiple grounds, including that plaintiffs' claims against it were barred by the federal Communications Decency Act (47 U.S.C. § 230), which immunizes providers of interactive computer services against claims that treat a provider as the publisher or speaker of content created by a third party.  The trial court

1

sustained Salesforce's demurrer without leave to amend. Plaintiffs now appeal, and we shall affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Allegations and Claims in the Second Amended Complaint*

According to the operative Second Amended Complaint (SAC), the website Backpage was a forum on which traffickers, pimps, and johns communicated with each other. (SAC ¶¶ 2, 10, 137.) Plaintiffs, all of whom were minors at the time of the incidents giving rise to the complaint, were allegedly "caused . . . [to enter] sex trafficking and sexual exploitation" through online ads that pimps and traffickers posted on Backpage. (SAC ¶¶ 131, 138.) Johns allegedly paid plaintiffs' traffickers money for sex and the traffickers paid the money to Backpage to run ads for the exploitation of plaintiffs. (SAC ¶¶ 153-154.) Plaintiffs were "made victims of sex trafficking by means of force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury to themselves and others, including family members." (SAC ¶ 178.)

Plaintiffs allege that the defendant, Salesforce, advertises itself as a company that can drive business growth through applications and technology that include customer relationship management (CRM) and market analytics, among other things. (SAC ¶ 143.) The Salesforce CRM platform, a type of software that Salesforce designed and administers, and for which Salesforce provides operational support, offers Salesforce's clients "tools" that lead to the clients' growth. (SAC ¶¶ 145, 147, 150.) Starting in about December 2013, Backpage contracted with Salesforce for "licenses and other assistance," including CRM. (SAC ¶¶ 140, 149, 155-156.) Salesforce's CRM software provided Backpage a number of tools and platforms that Backpage implemented and that led to Backpage's growth. (SAC § 152.) The tools and

2

platforms included, among other things, platforms for Backpage to contact and procure customers, a data deduplication tool, means to identify and categorize sales opportunities, means to manage marketing campaigns, and means to manage customer histories and customer social media activity. (SAC ¶ 150.)

Plaintiffs allege that Backpage's growth, which Salesforce had facilitated, led to Backpage needing additional Salesforce licenses and assistance, which in turn led to higher-priced contracts with Salesforce, for which Backpage paid with money it had received from the plaintiffs' traffickers. (SAC ¶¶ 152-155.) Salesforce continued to contract with Backpage and facilitate its growth even though Salesforce allegedly knew "what Backpage was being used for, that several Backpage officials were indicted for facilitating trafficking, and that [an unspecified Senate subcommittee] had declared Backpage knowingly facilitated the sex trafficking of minors," and even though Salesforce allegedly had a duty "to prevent atrocities such as sex trafficking from being proliferated by its technology." (SAC ¶¶ 158-159.) In particular, Salesforce allegedly engaged in actions and omissions that include failing to monitor the use of its platform for illegal activities, failing to monitor its customers to identify their participation in illegal activity, providing services to enable and further criminal activity, and violating California law. (SAC ¶¶ 186-187.)

Plaintiffs allege that Salesforce's actions and omissions were part of a civil conspiracy with Backpage to violate section 52.5 of the Civil Code (human trafficking) and section 236.1 of the Penal Code (same); that Salesforce acted with Backpage to deprive and violate the plaintiffs' personal

liberty; and that Salesforce's violations of the law caused injury and damage to them.[1] (SAC ¶¶ 177, 179, 182.)

Plaintiffs also allege that Salesforce's actions and omissions constituted negligence and caused their injuries. (SAC ¶¶ 183-190.) In addition, plaintiffs allege that Salesforce's actions and omissions involved an extreme degree of risk, that Salesforce was consciously indifferent to the rights of the plaintiffs, and that Salesforce's actions and omissions constituted gross negligence. (SAC ¶¶ 193-196.)

B.     *Proceedings in the Trial Court*

Plaintiffs filed their original complaint against Salesforce in March 2019, alleging causes of action for sex trafficking under section 52.5 of the Civil Code, negligence, negligence per se, gross negligence, and civil conspiracy. About two weeks later, before Salesforce had responded, they filed their First Amended Complaint, which alleged the same causes of action. In response to the First Amended Complaint, Salesforce met and conferred with plaintiffs about Salesforce's anticipated grounds for demurrer, including that plaintiffs' claims were barred by section 230 of the Communications Decency Act (47 U.S.C. § 230 (section 230)), which provides

---

[1] Civil Code section 52.5 authorizes a victim of human trafficking, as that term is defined in section 236.1 of the Penal Code, to sue for damages or other relief. (Civ. Code, § 52.5, subd. (a).) Penal Code section 236.1, subdivision (a), states that "[a] person who deprives or violates the personal liberty of another with the intent to obtain forced labor or services, is guilty of human trafficking." That section further provides that "[a] person who causes, induces, persuades, or attempts to cause, induce, or persuade a person who is a minor at the time of the commission of the offense to engage in a commercial sex act, with the intent to effect or maintain a violation of [certain Penal Code sections concerning crimes involving sexual assault, obscene matter, and extortion] is guilty of human trafficking." (Pen. Code, § 236.1, subd. (c).)

4

certain immunities to the providers or users of interactive computer services. After the parties met and conferred, plaintiffs informed Salesforce they would amend the First Amended Complaint to address some of the issues that had been discussed, and the parties stipulated that plaintiffs could file a Second Amended Complaint, to which Salesforce could then respond. When plaintiffs later informed Salesforce they would stand on the First Amended Complaint, Salesforce filed a demurrer on the grounds that plaintiffs failed to allege facts sufficient to constitute any of their causes of action and that the causes of action were barred by section 230.

Plaintiffs did not file a response to the demurrer; instead they filed a Second Amended Complaint alleging causes of action for sex trafficking under section 52.5 of the Civil Code, negligence, and gross negligence. Salesforce again demurred, on the same grounds.

Plaintiffs opposed the demurrer and requested leave to amend in the event that the trial court sustained the demurrer. The opposition was not specific about how the Second Amended Complaint might be amended, except as to the relationship between gross negligence and negligence, which is not at issue in this appeal.[2]

On the Friday afternoon before the scheduled Monday morning hearing on the demurrer, the trial court issued a tentative ruling sustaining the demurrer without leave to amend. Later that Friday afternoon, plaintiffs notified the court and Salesforce that they would contest the tentative ruling at the hearing, and identified the portions of the ruling they would contest. But on the Sunday night before the hearing, plaintiffs informed Salesforce they had filed a request to dismiss the complaint without prejudice; according

---

[2] In this appeal, plaintiffs address only their causes of action for sex trafficking and negligence.

5

to court records, the request was electronically submitted to the court at 12:01 on Monday morning.

At the hearing, the parties argued the merits of the demurrer, as well as whether the purported voluntary dismissal shortly after midnight rendered the demurrer moot.

The trial court concluded that after the announcement of an adverse tentative ruling on a dispositive motion, a plaintiff may not voluntarily dismiss the action without prejudice to avoid the adverse result. Turning to the merits of the demurrer, the court ruled that section 230 barred plaintiffs' claims. The ruling was based on the court's conclusion that Salesforce qualified as a provider of an interactive computer service under the statute and that because plaintiffs alleged that Salesforce's platform and CRM enabled Backpage to publish and disseminate the traffickers' advertisements that harmed them, plaintiffs were treating Salesforce as the publisher of information provided by third parties. The court also concluded that because plaintiffs sought to bring private state law civil claims against Salesforce (as opposed to private federal civil claims under 18 U.S.C. § 1595 (section 1595)) recent amendments to federal law did not exempt their claims from section 230 immunity. The court sustained the demurrer without leave to amend. In denying leave to amend, the court noted that plaintiffs already had an opportunity to amend their complaint after Salesforce filed a prior demurrer on the same grounds, a reference to the fact that Salesforce had demurred to the First Amended Complaint and, before the court could rule on it, plaintiffs filed their Second Amended Complaint. The court also stated that amendment would be futile, because plaintiffs' claims were barred by section 230 as a matter of law and could not be cured by amendment.

6

Plaintiffs moved for a new trial, arguing that their claims were not barred by section 230 and that the court should have granted leave to amend. Plaintiffs did not identify any facts they would allege or any claims they would add if leave to amend were granted, stating only that an amendment would "further clarify" the legal basis of the claims.[3]

The motion for new trial was denied, and plaintiffs timely appealed.

## DISCUSSION

A.    *Standard of Review*

Our standard of review is well-established. We accept as true the well-pleaded allegations in the operative complaint. (*Chiatello v. City and County of San Francisco* (2010) 189 Cal.App.4th 472, 480.) " ' " 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' [Citations.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.]" ' [Citation.] We likewise accept facts that are reasonably implied or may be interred from the complaint's express allegations. [Citations.] ' " 'A demurrer tests the legal sufficiency of the complaint . . . .' [Citations.] On appeal from a dismissal after an order

---

[3] Plaintiffs stated only that an amended complaint would "further clarify that: [¶] (1) Salesforce's liability stems from the custom-tailored tools Salesforce designed for Backpage to help Backpage engage in sex trafficking; [¶] (2) Salesforce engaged in conduct wholly separate from the tortious conduct Backpage was committing; [¶] (3) the 'but-for' causation test Salesforce has argued for, and the Court has relied upon, is not the test in the Ninth Circuit and has not been adopted by California courts; and [¶] (4) the error of Salesforce's argument is reinforced by the very passage of [Public Law 115-164]." We discuss Public Law 115-164, the "Fight Online Sex Trafficking Act" or "FOSTA," *post*.

7

sustaining a demurrer, we review the order de novo, exercising our independent judgment about whether the complaint states a cause of action as a matter of law. [Citations.]" ' " (*Ibid.*) Although our review is de novo, it is plaintiffs' burden to affirmatively demonstrate that the demurrer was erroneously sustained as a matter of law, which means that plaintiffs must show that they pleaded facts sufficient to establish each element of each cause of action. (*Intengan v. BAC Home Loans Servicing LP* (2013) 214 Cal.App.4th 1047, 1052.) Issues of statutory construction, such as the applicability of section 230 immunity at issue here, are questions of law subject to de novo review. (*California Taxpayers Action Network v. Taber Construction, Inc.* (2017) 12 Cal.App.5th 115, 125 (*California Taxpayers*).)

When the trial court has sustained a demurrer without leave to amend, " 'we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff.' " (*California Taxpayers*, *supra*, 12 Cal.App.5th at p. 125.) To make the required showing, which plaintiffs can do for the first time on appeal, plaintiffs must "show[ ] on appeal what facts could be pleaded to cure defects in the complaint and how they state a cause of action." (*Eghtesad v. State Farm General Ins. Co.* (2020) 51 Cal.App.5th 406, 411 (*Eghtesad*).) The failure to show how an amendment would allow plaintiffs to state a cause of action is fatal to a request for leave to amend. (*Denny v. Arntz* (2020) 55 Cal.App.5th 914, 926 (*Denny*) [citing *Rakestraw v. California Physicians' Service* (2000) 81 Cal.App.4th 39, 43, for the proposition that plaintiff must " 'clearly and specifically set forth the "applicable substantive law" and the

8

legal basis for amendment, i.e., the elements of the cause of action and authority for it,' and all specific factual allegations for the claim"].)

B.    *Analysis*

The central issue in this appeal is whether Salesforce and its alleged conduct fall within the provisions of section 230 such that Salesforce cannot be held liable for human trafficking and negligence in this case as a matter of law.  Plaintiffs argue that section 230 does not bar their claims and that in any event the trial court should have granted leave to amend.  We disagree.

1.    *Applicability of Section 230*

Section 230(c)(1) provides that "[n]o provider or user of an *interactive computer service* shall be treated as the publisher or speaker of any information provided by another information content provider."  (Italics added.)  Section 230(e)(3) provides that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."  Salesforce argues that suing it for human trafficking and negligence is inconsistent with section 230(c)(1) because Salesforce is a provider of an interactive computer service and the causes of action alleged against it treat it as a publisher or speaker of information that is provided by someone else (that is, by Backpage or sex traffickers, but not by Salesforce).

The provisions of section 230(c)(1) and 230(e)(3), often referred to as "immunity provisions," are broadly construed in cases that arise from the publication of user-generated content.  (*Doe v. MySpace, Inc.* (5th Cir. 2008) 528 F.3d 413, 418.)  As our Supreme Court has explained in *Hassell v. Bird* (2018) 5 Cal.5th 522, 534-535 (*Hassell*), the immunity provisions implement the policy goals of section 230, which include "promot[ing] the continued development of the Internet and other interactive computer services and

9

other interactive media" (§ 230(b)(1)) and "preserv[ing] the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation." (§ 230(b)(2).)

To claim immunity under section 230, a defendant must establish that " '(1) the defendant [is] a provider or user of an interactive computer service; (2) the cause of action treat[s] the defendant as a publisher or speaker of information; and (3) the information at issue [is] provided by another information content provider.' " (*Delfino v. Agilent Technologies, Inc.* (2006) 145 Cal.App.4th 790, 804-805 (*Delfino*).) Although the facts of this case, as alleged in the Second Amended Complaint, are not entirely parallel to the facts of any of the cases cited by the parties, we conclude that plaintiffs' allegations establish that Salesforce is immune from their claims under section 230.

a.  *Salesforce Is a Provider of an Interactive Computer Service*

An "[i]nteractive computer service" is defined to include "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet." (§ 230(f)(2).) An "[a]ccess software provider" is a "provider of software (including client or server software) or enabling tools that do any one or more of the following: [¶] (A) filter, screen, allow, or disallow content; [¶] (B) pick, choose, analyze, or digest content; or [¶] (C) transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content." (§ 230(f)(4).)

As reflected in the language above, the term "interactive computer service" is broadly defined. The term is also broadly interpreted. It applies

to websites that allow third party users to post content, as plaintiffs acknowledge, but it is by no means limited to websites, or to websites of that kind. "The definition of 'interactive computer service' on its face covers '*any*' information services or other systems, as long as the service or system allows 'multiple users' to access 'a computer server.' Further, the statute repeatedly refers to 'the Internet and *other* interactive computer services,' (emphasis added), making clear that the statutory immunity extends beyond the Internet itself. [Citations.] Also, the definition of 'interactive computer service' after the broad definitional language, states that the definition '*include[es]* specifically a service or system that provides access to the Internet,' § 230(f)(2) (emphasis added), thereby confirming that services providing access to the Internet as a whole are only a subset of the services to which the statutory immunity applies." (*Batzel v. Smith* (9th Cir. 2003) 333 F.3d 1018, 1030.)

*Zango, Inc. v. Kaspersky Lab, Inc.* (9th Cir. 2009) 568 F.3d 1169 (*Zango*) provides an example of the breadth of the term "interactive computer service." In *Zango*, an online media company sued the distributor of software that allegedly interfered with the use of the media company's downloadable programs. (*Id.* at p. 1170.) The court in *Zango* concluded that the defendant, a company distributing software that "helps filter and block unwanted malicious software," is a "provider" of an " 'interactive computer service' " under the terms of section 230(c). (*Id.* at pp. 1170, 1175.) In reaching that conclusion the court rejected the plaintiff's proposed interpretation of " 'interactive computer service,' " which would have applied the term only to services that "enables people to access the Internet or access content found on the Internet." (*Id.* at pp. 1175-1176.)

11

Plaintiffs correctly note that *Zango* concerned immunity under section 230(c)(2)(B), a statutory provision that is not at issue here.[4] (*Zango, supra,* 568 F.3d at p. 1170.) But *Zango* is still relevant, because section 230(c)(1) (at issue here), and section 230(c)(2)(B) (at issue in *Zango*), both apply to a "provider or user of an interactive computer service," as "interactive computer service" is defined in section 230(f).

We conclude that Salesforce, as described in the allegations of the Second Amended Complaint, falls within the section 230 definition of a "interactive computer service" because the only conclusion to be drawn from plaintiffs' allegations is that Salesforce is an "access software provider," as defined in section 230(f)(4). Plaintiffs allege Salesforce provided Backpage with software that included tools that allowed Backpage to "contact and procure customers," "identif[y] and categoriz[e] sales opportunities," "gather[ ] and manag[e] information from Backpage's traffickers and pimps' public social media activity," and "collect[ ] and manag[e] traffickers' and pimps' data across multiple sources and channels." (SAC ¶¶ 147, 150.) In other words, plaintiffs allege that Salesforce is "a provider of . . . enabling tools that . . . transmit, receive, display, forward . . . search, . . . organize, [or] reorganize . . . content." (§ 230(f)(4)(C).)

The Second Amended Complaint also includes allegations that Salesforce meets the additional definitional requirement for "interactive

---

[4] Section 230(c)(2)(B) states that "[n]o provider or user of an interactive computer service shall be held liable on account of . . . any action taken to enable or make available to information content providers or others the technical means to restrict access to [material including that which the provider or user considers obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected]." (*Zango, supra*, 568 F.3d at p. 1173.)

computer service"—that the access software provider "provides or enables computer access by multiple users to a computer server." (§ 230(f)(2).) By alleging that the tools provided by Salesforce to Backpage included a "secure cloud storage database for Backpage to store" the details of its business (SAC ¶ 150); "licenses" for Backpage users to access the cloud database (SAC ¶¶ 152-155); and "platforms for Backpage to contact and procure customers" (SAC ¶ 150), plaintiffs have alleged that Salesforce provided or enabled computer access by multiple users at Backpage to a computer server or servers.

b. *Plaintiffs' Causes of Action Treat Salesforce as a Publisher or Speaker of Information Provided by Someone Other than Salesforce*

Having determined that the Second Amended Complaint alleges that Salesforce is the provider of an interactive computer service, we must now consider whether the alleged causes of action treat Salesforce as the publisher or speaker of information provided by another information content provider, as required for immunity under section 230(c)(1). (*Delfino*, *supra*, 145 Cal.App.4th at pp. 804-805.)

Here, the plaintiffs allege they were injured by online advertising, placed on Backpage by pimps and traffickers, that caused them to enter sex trafficking and be sexually exploited. (SAC ¶ 138.) In their causes of action against Salesforce for sex trafficking and negligence, they seek to hold Salesforce liable for their injuries. Those injuries, however, arose from information provided online by pimps and traffickers in their ads, and not from information provided by Salesforce, which plaintiffs seek to hold liable by virtue of its breach of its purported duty "to monitor for and safeguard from the use of its platform for illegal activities, including sex trafficking," and "to monitor its customer base to identify participation in an illegal

13

venture." (SAC ¶¶ 186-188.) From these allegations we conclude that plaintiffs seek to treat Salesforce as the publisher of ads created by a third party, and that as a result Salesforce is immune from the claims under section 230(c)(1).

"Section 230(c)(1) is concerned with liability arising from information provided online." (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 49, italics omitted.) It "provides immunity from claims by those offended by an online publication." (*Ibid.*) Although the terms "publisher" and "speaker" in section 230(c)(1) are "drawn from the law of defamation" (*ibid.*), the immunity provided by section 230(c)(1) is not limited to defamation claims. (*Barnes v. Yahoo!, Inc.* (9th Cir. 2009) 570 F.3d 1096, 1101-1102 (*Barnes*).) "[W]hat matters is whether the cause of action inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another. To put it another way, courts must ask whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a 'publisher or speaker.' If it does, section 230(c)(1) precludes liability." (*Id.* at p. 1102.)

Plaintiffs here do not contend that the information or content of the advertisements that harmed them was provided by Salesforce. Instead, relying on *Doe v. Internet Brands, Inc.* (9th Cir. 2016) 824 F.3d 846 (*Internet Brands*), they argue that their claims do not relate to any decisions about editing, monitoring, or removing third-party content, and therefore their claims do not treat Salesforce as a publisher of the advertisements. This argument is undercut by plaintiffs' allegations that Salesforce had, and breached, a duty to monitor the use of its platform and the activities of Backpage. (SAC ¶ 186.)

*Internet Brands* is in any event inapposite.  In that case, the plaintiff, an aspiring model, became a member of a networking website for models that was operated by the defendant.  (*Internet Brands*, *supra*, 824 F.3d at p. 848.) The plaintiff posted her profile on the website and was contacted by two men who identified her through the website, posed as talent scouts, and raped her while she was attending a sham audition.  (*Id.* at p. 849.)  The plaintiff alleged that the website owner and operator knew from an outside source (and not from monitoring postings on the website) the predators and their activities and knew that members who posted their profiles had been victimized by the predators, but failed to warn members of the danger. (*Ibid.*)

*Internet Brands* did not consider whether California law imposed a duty to warn on the website owner, but simply considered whether section 230 barred such a claim.  (*Internet Brands, supra,* 824 F.3d at p. 850.)  In determining that the claim was not barred, the Court of Appeals noted that the failure to warn claim did not seek to hold the website owner liable as the publisher or speaker of any user content.  (*Id.* at p. 853.)  In that respect *Internet Brands* is different from the case before us (where plaintiffs seek to hold Salesforce liable for harm caused through ads posted on Backpage by pimps and traffickers), and from other cases alleging a duty arising from failure to regulate access to or use of a platform or content.  (See *Doe II v. MySpace, Inc.* (2009) 175 Cal.App.4th 561, 573 [section 230 bars claims based on decision "to restrict or make available certain material"]; *Daniel v. Armslist, LLC* (Wisc. 2019) 926 N.W.2d 710, 726 [section 230 bars claims that defendant "provided an online forum for third-party content and failed to adequately monitor that content"]; *Fields v. Twitter, Inc.* (N.D. Cal. 2016) 217 F.Supp.3d 1116, 1123-1126 [section 230 bars claims arising from decision to

15

provide user accounts to ISIS, which used the accounts to post objectionable content].)

Plaintiffs here seek to hold Salesforce liable for the effect of the ads that Backpage customers posted on Backpage. Yet "[s]ection 230(c)(1) is implicated not only by claims that explicitly point to third party content but also by claims which, though artfully pleaded to avoid direct reference, implicitly require recourse to that content to establish liability or implicate a defendant's role, broadly defined, in publishing or excluding third party [c]ommunications." (*Cohen v. Facebook, Inc.* (E.D.N.Y. 2017) 252 F.Supp.3d 140, 156.) The gravamen of plaintiffs' claims against Salesforce is that Salesforce software facilitated Backpage's cultivation of sex traffickers as customers. That Backpage and not Salesforce cultivated the customers is clear from plaintiffs' allegation that Backpage implemented Salesforce software to "prepare the right outreach" to Backpage customers. (SAC ¶ 150.)

In alleging that Salesforce failed to prevent Backpage from using Salesforce tools in Backpage's business of soliciting ads from sex traffickers (ads that allegedly caused the plaintiffs to be sexually trafficked and exploited), plaintiffs essentially seek to hold Salesforce responsible as a publisher of information in ads that Backpage customers posted on Backpage. That plaintiffs would hold Salesforce liable as a publisher is clear from plaintiffs' allegations that Salesforce's liability arises from its "[f]ailure to monitor for and safeguard from the use of its platform" by Backpage for sex trafficking and its "[f]ailure to monitor its customer base to identify participation in an illegal venture" (SAC ¶ 186), which would require Salesforce to monitor not just Backpage's use of the CRM platform to communicate with Backpage customers, but also the ads posted on Backpage.

16

(*HomeAway.com, Inc. v. City of Santa Monica* (9th Cir. 2019) 918 F.3d 676, 682 [immunity under section 230 attaches when a duty "would necessarily require" an interactive computer service to "monitor third-party content"].)

          c.     *Section 230 Preempts Plaintiffs' State Law Claims for Sex Trafficking*

The immunity afforded by section 230(c)(1) does not apply to certain criminal prosecutions for sex trafficking brought under state or federal law (§ 230(e)(5)(B) & (C)), or to "any claim in a civil action brought under section 1595 of Title 18, if the conduct underlying the claim constitutes a violation of section 1591 of that title." (§ 230(e)(5)(A).) Although plaintiffs' suit against Salesforce is neither a criminal action nor a civil action brought under federal law, plaintiffs argue that their sex trafficking claims are not barred by section 230 because they are "not inconsistent" with section 230.

Plaintiffs argue that because the heading to section 230(c) is "Protection for 'Good Samaritan' blocking and screening of offensive material," and because nothing in their complaint involves Salesforce acting as a "Good Samaritan," there is nothing inconsistent between plaintiffs' claims and section 230. But section headings are " 'not meant to take the place of the detailed provisions of the text.' " (*Lawson v. FMR LLC* (2014) 571 U.S. 429, 446 (*Lawson*).) Although section 230(c)(2) provides immunity in situations where an internet computer service is used to restrict access to obscene or otherwise objectional material and therefore addresses "Good Samaritan" immunity, section 230(c)(1) is not limited in that way. In discussing the "broad scope of section 230 immunity," our Supreme Court has explained that section 230(e)(3), "read in connection with section 230(c)(1) and the rest of section 230, conveys an intent to shield Internet intermediaries from the burdens associated with defending against state-law

17

claims that treat them as the publisher or speaker of third party content." (*Hassell*, *supra*, 5 Cal.5th at p. 544.)

In a further attempt to argue that their state law civil sex trafficking claims are not inconsistent with section 230, plaintiffs refer us to Public Law 115-164, or "FOSTA," which amended section 230(e) by adding section 230(e)(5). (Pub.L. No. 115-164 (Apr. 11, 2018) 132 Stat. 1253.) Plaintiffs argue that the heading of section 230(e)(5), "No effect on sex trafficking law," shows that their state law sex trafficking claim is not inconsistent with section 230. That heading, however, is no more dispositive than the heading of section 230(c), and it does not override the specific provisions of section 230(e)(5). (*Lawson*, *supra*, 571 U.S. at p. 446.) Insofar as civil claims are concerned, section 230(e)(5) applies only to "any claim in a civil action brought under section 1595 of Title 18, if the conduct underlying the claim constitutes a violation of section 1591 of that title." (§ 230(e)(5)(A).) Plaintiffs' suit against Salesforce is not such a civil action.

In a related argument, plaintiffs refer us to the text of FOSTA. In the preamble, Congress describes FOSTA as an act "[t]o amend the Communications Act of 1934 to clarify that section 230 of such Act does not prohibit the enforcement against providers and users of interactive computer services of Federal and State criminal and civil law relating to sexual exploitation of children or sex trafficking, and for other purposes." (Pub.L. No. 115-164, *supra*.) Congress further stated that "It is the sense of Congress that—[¶] . . . section 230 . . . was never intended to provide legal protection to websites that unlawfully promote and facilitate prostitution and websites that facilitate traffickers in advertising the sale of unlawful sex acts with sex trafficking victims." (*Ibid.*) But these statements do not help plaintiffs here, because prefatory language, even prefatory language that appears in a

18

statute, "does not change the plain meaning of the operative clause." (*Kingdomware Technologies, Inc. v. U.S.* (2016) 579 U.S. 162, 173 [citing *Yazoo & Mississippi Valley R. Co. v. Thomas* (1889) 132 U.S. 174, 188 for the proposition that "prefatory clauses or preambles cannot change the scope of the operative clause"]; see also *Chambers v. Miller* (2006) 140 Cal.App.4th 821, 825-826 ["[a] statute's preamble . . . does not override its plain operative language"].)

Because we conclude that plaintiffs' claims are barred by section 230, we need not reach Salesforce's alternative argument that plaintiffs' Second Amended Complaint is properly dismissed because it fails to plead facts that would establish each element of each of their causes of action.

2.    *Leave to Amend*

Plaintiffs argue that the trial court erred in denying leave to amend, and state that if leave had been granted they could have added a claim under section 1595, and also could have added "more detailed" allegations showing that their claims are not barred by section 230.  The arguments lack merit.

To begin, we reject plaintiffs' suggestion that because they had no fair opportunity to amend their complaint in response to the demurrer the trial court should have granted leave to amend.  Plaintiffs rely on *Eghtesad, supra,* 51 Cal.App.5th 406, where this court held that the trial court erred in denying leave to amend an initial complaint.  (*Id.* at pp. 413-414.)  Here, in contrast, the trial court denied leave to amend plaintiffs' *third* complaint. Further, plaintiffs here not only had the opportunity to amend their complaint to consider and address the issues raised in their meet and confer session with Salesforce and the subsequent demurrers; they also took advantage of their opportunity to do so.  Salesforce's demurrer to the Second Amended Complaint raised the same issues that had been raised in the

19

demurrer to the First Amended Complaint. Plaintiffs chose to amend their First Amended Complaint before the demurrer could be heard, but they did not cure the defects Salesforce had identified.

We turn now to plaintiffs' argument, made for the first time on appeal, that if granted leave to amend, they would add a federal claim under section 1595, which authorizes victims of human trafficking to file civil actions to recover damages and attorney fees. (§ 1595(a).) We are loath to conclude that the trial court should have granted plaintiffs leave to amend their complaint, which alleged only state law causes of action, to allege a new cause of action under federal law when plaintiffs never indicated to the trial court any desire or intention to add such a claim, including in their new trial motion. To do so would be to hold that the trial court abused its discretion by failing to research federal causes of action and invite plaintiffs to change their legal theory in the absence of any indication that the plaintiff wished to do so. (See *Camsi IV v. Hunter Technology Corp.* (1991) 230 Cal.App.3d 1525, 1528-1529 [absent a request for leave to amend in a specific way, there is abuse of discretion in denying leave to amend "only if a potentially effective amendment were both apparent and consistent with the plaintiff's theory of the case"].)

In any event, we reject plaintiffs' argument because plaintiffs fail to meet their burden to show that they can plead such a claim. As plaintiffs observe, with certain exceptions, section 230 does not bar civil claims brought under section 1595 "if the conduct underlying the claim constitutes a violation of section 1591 of that title." (§ 230(e)(5)(A.) Title 18 United States Code section 1591 makes the sex trafficking of children a crime. But it is not enough for plaintiffs to state in their opening brief that section 1595(a) allows a victim of a violation of section 1591 to sue "the perpetrator (or whoever

20

knowingly benefits . . . from participating in a venture which that person knew or should have known has engaged in an act in violation of this chapter).” (§ 1595(a).) Plaintiffs must specifically set forth the applicable law, which means they must identify the elements of a violation of section 1591 and explain how the facts they have alleged, or could allege, state the required elements of a violation. (*Denny, supra*, 55 Cal.App.5th at p. 926.) They fail to do that. It is not enough for plaintiffs to simply represent, as they do in their opening brief on appeal, that if given the opportunity to amend they could allege some unspecified fact or facts. Nor does it suffice for plaintiffs to merely point us to two pages of a First Amended Complaint their attorneys filed against Salesforce and Backpage in federal court in the Southern District of Texas on behalf of a different plaintiff altogether. The Texas plaintiff purports to state causes of action under section 1595 against Salesforce and Backpage, but nothing in plaintiffs’ brief (or on the pages of the Texas complaint that plaintiffs’ cite in the brief) identifies or addresses the elements of a violation of section 1591.[5] Plaintiffs’ abbreviated and belated attempt in their reply brief to outline the requirements of section 1591 is to no avail. (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764 [points raised for the first time in a reply brief are not considered absent a showing of good cause for failing to present them earlier].)

Plaintiffs also argue that they should have been granted leave to amend their complaint to add allegations showing that section 230 does not bar their claims against Salesforce. They identify five paragraphs they could

---

[5] On July 7, 2020, plaintiffs filed their request that we take judicial notice of the Texas complaint. Three days later, plaintiffs’ counsel filed a Second Amended Complaint in the Texas action, purportedly in response to Salesforce’s service of a motion for sanctions under rule 11 of the Federal Rules of Civil Procedure.

21

add to their Second Amended Complaint to make such a showing, but the allegations in those paragraphs undermine plaintiffs' argument that Salesforce is not an interactive computer service.

According to the proposed paragraphs, Salesforce software and tools allow Backpage to "process credit cards, . . . text potential and past clients, . . . [and] reach more and more traffickers." The software gives Backpage the capacity for "direct marketing campaigns" and "information gathering such as ad clicks and tracking internet activity of sex traffickers." Backpage used the software to market itself to its customers: Backpage, not Salesforce, "actively obtain[ed] and monitor[ed] data and additional information related to pimps and sex traffickers that were using Backpage." Backpage, not Salesforce, engaged in "marketing efforts" directed to sex traffickers. Plaintiffs' proposed paragraphs, which reiterate and expand upon points made in the Second Amended Complaint, make even more clear that Salesforce is an interactive computer service as defined in sections 230(f)(2) and 230(f)(4) and that plaintiffs' claims seek to treat Salesforce as the publisher of information provided by Backpage and others, contrary to section 230(c)(1).

## DISPOSITION

The judgment is affirmed. Defendant shall recover its costs on appeal.

22

_____

Miller, J.

WE CONCUR:


_____

Stewart, Acting P.J.


_____

Kline, J.*



A159566, *Jane Does #1-50 v. Salesforce.Com, Inc.*

---

*  Assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.